# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TAMARA L. CLEMONS,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-119
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Tamara L. Clemons brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security ("Commissioner") denying

her application for disability insurance benefits ("DIB"). This matter is before the Court on

plaintiff's statement of errors (Doc. 11), the Commissioner's response in opposition (Doc. 12),

and plaintiff's reply (Doc. 13).

## I. Procedural Background

Plaintiff protectively filed her application for DIB on September 24, 2014, alleging

disability since September 27, 2013, due to fibromyalgia, tendonitis of both hands and feet,

endometriosis, diabetes, severe depression and anxiety, bladder wall dysfunction, interstitial

cystitis, migraines with visual disturbance, irritable bowel syndrome and gastroenteritis. (Tr.

275). The alleged onset date was subsequently amended to September 27, 2014 at plaintiff's

request. The application was denied initially and upon reconsideration. Plaintiff, through

counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ")

Thomas J. Sanzi. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ

hearing held via video on April 27, 2016. On January 13, 2017, the ALJ issued a decision

denying plaintiff's DIB application. This decision became the final decision of the

Commissioner when the Appeals Council denied review on December 27, 2017.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The impairment must render the claimant unable to engage in the work previously performed or

in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §

423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2017.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since September 27, 2014, the amended alleged onset date (20 CFR 404.1571, *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: Diabetes Mellitus Type II, Irritable Bowel Syndrome, Obesity, Left Foot Peroneal Tendon Tear Status Post Repair, Depressive Disorder, Anxiety Disorder, and Post-Traumatic Stress Disorder (20 CFR 404.1520(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, [the ALJ] find[s] that the [plaintiff] has the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) except she can never climb ladders, ropes, or scaffolds, can occasionally climb ramps or stairs, and can occasionally stoop, crouch, kneel, and crawl. She must avoid all use of moving machinery and all exposure to unprotected heights. She is limited to work that allows her to be off task five percent of the day in addition to regularly scheduled breaks, and work in a low stress job defined as having only occasional decision making required and only occasional changes in the work setting. She is additionally limited to only occasional interaction with the public and with co-workers.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[2]

7. The [plaintiff] was born [in] . . . 1982 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from September 27, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 46-59).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[2] Plaintiff's past relevant work was as a Foreclosure Specialist, a sedentary, skilled job; a Sterilization Specialist, a light, semi-skilled position; and a receptionist, a sedentary, semi-skilled position. (Tr. 57, 94-95).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled jobs such as sorter, with 305,000 jobs in the national economy; assembler, with 515,000 jobs in the national economy; and packer, with 630,000 jobs in the national economy. (Tr. 58, 96).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Error**

On appeal, plaintiff alleges that the ALJ erred in evaluating the medical opinion evidence and by rejecting the opinions of plaintiff's treating psychiatrist and therapist, the consultative examining psychologist, and the state agency non-examining medical sources. (Doc. 11 at 9). Plaintiff contends the ALJ committed reversible error by failing to mention or evaluate the opinion of treating podiatrist Dr. John Stevenson, D.P.M. Plaintiff argues that the ALJ improperly substituted his opinion for every "relevant medical opinion" in the record. *Id*.

## 1. Weight to the medical opinion evidence

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Rogers*, 486 F.3d at 242.

A treating source's medical opinion must be given controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2) ; *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544. *See also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4).

In addition, an ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the claimant's] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2). The ALJ's reasons must be "supported by the evidence in the case record, and

must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5). This requirement serves a two-fold purpose: (1) it helps a claimant to understand the disposition of h[er] case, especially "where a claimant knows that h[er] physician has deemed h[er] disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544.

Opinions from non-treating and non-examining sources are never assessed for "controlling weight." A non-treating source's opinion is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6). Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the medical opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c)(3).

"A failure to follow the procedural requirement 'of identifying the reasons for discounting the [treating physician's] opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Rogers*, 486 F.3d at 243). *See also Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545) (remand is

appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" and the ALJ's opinion does not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.). However, remand is not necessary if the ALJ's failure to provide good reasons is a "harmless *de minimis* procedural violation." *Blakley,* 581 F.3d at 409. The Sixth Circuit has identified three situations in which harmless error might occur: (1) where the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) where "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; and (3) "where the Commissioner has met the goal of . . . the procedural safeguard of reasons." *Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 438 (6th Cir. 2018) (quoting *Wilson*, 378 F.3d at 547). The goal of the procedural safeguard may be met when the "'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Id*. (quoting *Friend*, 375 F. App'x at 551) (emphasis in the original).

### 2. Medical opinion evidence related to plaintiff's physical impairments

The ALJ reviewed the history of plaintiff's feet/ankle impairments in his written decision. (Tr. 52-54). On July 11, 2013, plaintiff complained to her primary care physician, Dr. Dennis Bingham, M.D., about left ankle pain and swelling that had started one week earlier. (Tr. 411). She was working at the time at a job which required "quite a bit of prolonged standing and walking," and her ankle pain and swelling worsened after periods of prolonged standing or walking. (*Id*.). Plaintiff was diagnosed with possible ankle tendonitis. (Tr. 413). Dr. Bingham prescribed a prednisone taper and recommended applying warm moist heat to the left ankle for 20 minutes two to three times daily and avoiding prolonged standing/walking,

repetitive bending, twisting, squatting or stooping for the next 5 to 7 days. (*Id.*). Plaintiff was to contact his office if there was no improvement in her symptoms over the next 10 to 14 days. (*Id.*).

On August 13, 2013, plaintiff's only complaint pertained to her continuing difficulties with fibromyalgia. (Tr. 399). She reported "morning stiffness as well as muscle aches and pains involving the larger muscles of her upper arms, back and lower extremities." (*Id.*). She "otherwise [was] doing well" and reported no new complaints at that time. (*Id.*). She was scheduled for follow-up in six months. (Tr. 402). At a February 5, 2014 visit for routine follow-up of her chronic medical conditions and routine lab work, plaintiff did not report any foot or ankle issues and the treatment notes reflect no such findings on examination. (Tr. 387-90). Plaintiff was advised to follow-up in six months. (Tr. 390).

Plaintiff next reported ankle issues to Bingham on August 1, 2014, over one year after her initial complaint. (Tr. 380). She complained to Dr. Bingham of bilateral ankle swelling and pain that had been occurring for three to four weeks. (*Id.*). The pain was "aching to throbbing" and became sharp with inversion and eversion of the feet. (*Id.*). Plaintiff reported that she "recently started a new job which requires her to do quite a bit of standing and walking." (*Id.*). She had obtained only "modest improvement" from ankle wraps and over-the counter ibuprofen. (*Id.*). On examination, plaintiff had bilateral ankle swelling, tenderness on palpation, and pain with dorsi flexion, eversion and inversion. (Tr. 381-82). She was diagnosed with ankle tendinitis, pain and swelling. (Tr. 382). The plan was to treat the condition with a Depo-Medrol injection and dexamethasone taper and the application of warm moist heat for 20-30 minutes two to three times daily. (*Id.*). Dr. Bingham recommended that plaintiff perform no prolonged standing, kneeling or walking and no repetitive bending, squatting

9

or twisting for the next five to seven days. (Tr. 383). Dr. Bingham's September 4, 2014 treatment notes reflect that plaintiff's only concern was with pain and swelling involving her left ankle, which had recurred shortly after she completed her course of medications. (Tr. 368). Dr. Bingham diagnosed left ankle pain and referred plaintiff to a podiatrist, Dr. Stevenson, for the persistent pain and swelling of her left ankle. (Tr. 370-71).

Dr. Stevenson began treating plaintiff on September 26, 2014, for chronic and throbbing bilateral foot pain of gradual onset which plaintiff described as severe. (Tr. 454). Plaintiff reported that she restricted weight-bearing activity. (*Id.*). She reported her symptoms were alleviated by shoe wear modification and rest and were exacerbated by activity. (*Id.*). Dr. Stevenson examined plaintiff and diagnosed her with tendonitis of the peroneals and sinus tarsitis, a bone spur, pain in the limb, metatarsalgia, capsulitis, plantar fasciitis, and post tibialis tendinitis. (Tr. 455). He discussed treatment options with plaintiff, including physical therapy, custom-made orthotics, medications, and surgery, and he applied "low-dye strapping" (taping) to plaintiff's feet which she was to keep in place for 3 to 5 days. (*Id.*).

When Dr. Stevenson saw plaintiff on November 22, 2014, she complained of continued severe foot pain. (Tr. 450-51). Treatment options were reviewed and plaintiff was given a Kenalog shot. (Tr. 450-51). A left ankle MRI performed on December 3, 2014 disclosed a longitudinal split in the peroneus brevis tendon with tenosynovitis. (Tr. 467). Dr. Stevenson fitted plaintiff for a pneumatic CAM (controlled ankle motion) walker on December 5, 2014 based on the MRI results and due to "significant edema requiring increased compression and stability not otherwise achieved with a non-pneumatic Cam boot, to eliminate pain and immobilize the foot to allow healing of the traumatized area, to help control edema fluctuations due to the injury, and to eliminate pain, inflammation and gait instability." (Tr. 474-75).

After the injury failed to improve with conservative therapy, surgeon Dr. Gary LaBianco, D.P.M., performed a repair of her left peroneal tendon tear on January 8, 2015, and a posterior splint was applied. (Tr. 682).

On January 24, 2015, Dr. Stevenson issued an assessment in which he reported that he had first seen plaintiff on September 26, 2014 and had last seen her on December 5, 2014. (Tr. 471-73). He diagnosed plaintiff with a tear of the peroneal brevis tendon and tenosynovitis of the left foot/ankle. (Tr. 472). He reported that the condition had its onset in the summer of 2014, its course was chronic, and it was "recalcitrant to conservative care." (*Id.*). The pertinent findings on clinical examination were pain at the left peroneal tendons and the subtalar joint on the left. Dr. Stevenson reported that a MRI showed tenosynovitis and tear of the peroneus brevis tendon. (*Id.*). He reported that plaintiff was allergic to NSAIDS (nonsteroidal anti-inflammatory drugs), she was currently fitted with a CAM Walker, and she had previously been treated with injections and shoe orthotics. (*Id.*). He opined that plaintiff's condition "severely affected" her ability to "stand/walk/bend/stoop/lift." (Tr. 473). He reported that she was doing poorly when he last saw her, but he had not seen plaintiff since December 5, 2014. (*Id.*). Post-surgery follow-up notes through April 10, 2015 report that plaintiff was doing well and that her range of motion was "coming along." (Tr. 679).

Dr. Amita Oza, M.D., examined plaintiff for disability purposes on April 13, 2015. (Tr. 563-68). Plaintiff was wearing a special boot and was not weight-bearing at that time following her January surgery for the left peroneal tendon tear. (Tr. 563). Plaintiff reported that her right ankle had also started to hurt and it shook on weightbearing and standing for more than five to ten minutes. (*Id.*). Plaintiff said she was told she might have a tear in the right tendon and she would undergo surgery on the right tendon after she recuperated from the left peroneal

tendon surgery. (*Id.*). Since plaintiff could not weight-bear, Dr. Oza did not check range of motion of the lumbosacral spine. (Tr. 564).

In the prone position, plaintiff's range of motion at the hips towards extremes caused some discomfort, but she exhibited full range of motion at both knees. She had swelling, very minimal movement, and very painful inversion of the right ankle. Dr. Oza noted that plaintiff walked on crutches and was wearing a boot and Aircast. She was non-weight-bearing on her left ankle and somewhat unstable even on her right ankle. Dr. Oza noted sensory examination was intact but DTRs (deep tendon reflexes) could not be obtained. Dr. Oza concluded:

> She [] had left ankle tendon surgery in January. She is recuperating, but she is not allowed to weight bear completely yet and she has pain in her right ankle and she may need surgery on the right ankle also, so it appears at this time because of her inability to bear weight, work-related activities are difficult physically speaking. . . .

(*Id.*).

Plaintiff reportedly was "doing well" at post-surgery follow-ups in May and June 2015, but she continued to have some ankle pain. (Tr. 678-79).

On September 9, 2015, Dr. Marc Klein, D.P.M., surgically removed a bunion from plaintiff's right foot. (Tr. 769). Plaintiff's condition was assessed as "well-healed" during her post-operative follow-up visit on October 5, 2015. (Tr. 772).

The ALJ found that plaintiff's "severe" impairments included "Left Foot Peroneal Tendon Tear Status Post Repair." (Tr. 46). The ALJ noted in his review of the evidence that plaintiff also underwent a right foot bunion removal on September 9, 2015, but there was no evidence of complications or continued limitations. (Tr. 47, citing Tr. 769-79). When evaluating plaintiff's impairments under the Listings, 20 C.F.R. Pt. 404, Subpt. P, App. 1, the ALJ found that the medical evidence did not demonstrate "an inability to ambulate effectively"

12

and she was "able to return to effective ambulation within 12 months of onset with the use of orthotics and other modified footwear. . . ." (Tr. 48, citing Tr. 493-538; Tr. 678-82).

Plaintiff argues that the ALJ erred by failing to mention or evaluate treating podiatrist Dr. Stevenson's opinion that her impairments "severely affected" her ability to "stand/walk/bend/stoop/lift" and that she was doing poorly when Dr. Stevenson last saw her, which was on December 5, 2014. (Tr. 473). Plaintiff contends that the ALJ's failure to evaluate Dr. Stevenson's opinion was not harmless error because (1) Dr. Stevenson provided his finding on a form provided by the state agency and it is consistent with Dr. Oza's findings made several months later, and (2) Dr. Stevenson's finding is inconsistent with the ability to perform light work, which requires a good deal of walking or standing and the ability to lift up to 20 pounds. (Doc. 11 at 10, citing 20 C.F.R. § 404.1567(b)).

The Commissioner alleges in response that the ALJ considered Dr. Stevenson's opinion, but the Commissioner acknowledges the ALJ did not weigh the opinion. (Doc. 12 at 3, citing Tr. 54). The Commissioner argues that the ALJ's omission was harmless error. (*Id.*). The Commissioner contends that the ALJ considered Dr. Stevenson's December 5, 2014 report that MRI results showed a left foot peroneus brevis tear, she was fitted with a pneumatic cast boot, and standing and walking limitations were noted. (*Id.* at 10, citing 54). The Commissioner asserts that Dr. Stevenson did not treat plaintiff after that date, she underwent surgical repair of the left foot peroneus brevis tear on January 8, 2015, and she reportedly did well after surgery. (Doc. 12 at 10-11; *see* Tr. 678-82). The Commissioner thus argues that Dr. Stevenson's opinion that plaintiff's tendon tear "severely affected" her physical functioning applies to only a brief period from September to December 2014 during which he treated plaintiff. The Commissioner contends that given this short time-frame, the opinion would not have assisted the

ALJ in determining whether plaintiff's impairments were disabling for a continuous period of 12 months or more as required under the regulations. (*Id.* at 11, citing 20 C.F.R. § 404.1509) ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").

The Court finds that the ALJ's failure to evaluate and weigh Dr. Stevenson's opinion in accordance with the regulations was harmless error. Even if Dr. Stevenson's opinion that plaintiff's left tendon tear "severely affected" her ability to "stand/walk/bend/stoop/lift" is credited, there is no evidence that these severe limitations persisted for a period of 12 months or more. Plaintiff complained to Dr. Stevenson in August 2014 that she had been having foot/ankle pain for three to four weeks, or from some time beginning in July 2014. (Tr. 380). Dr. Stevenson completed his January 2015 assessment finding severe functional restrictions attributable to plaintiff's left foot/ankle impairment after having last seen plaintiff in December 2014, prior to surgery to repair her tendon tear. (Tr. 473). Dr. Stevenson's opinion therefore sheds no light on plaintiff's functionality following her January 2015 surgery. Dr. Oza's April 2015 evaluation provides information about plaintiff's condition and functioning three months post-surgery, at which point plaintiff was still in an ankle boot and was not weight-bearing. (Tr. 563-68). However, her report does not indicate how long plaintiff's post-surgical restrictions were expected to last. Plaintiff has not pointed to any other medical evidence that shows her left foot/ankle condition persisted for several more month and continued to impose debilitating restrictions into July or August of 2015, 12 months from the date Dr. Bingham documented her persistent left ankle pain and swelling had begun.

Thus, Dr. Stevenson's assessment, read in conjunction with the other evidence of record, supports a finding that plaintiff suffered from a debilitating left ankle/foot impairment from July

2014 to at least some point in April 2015. However, his assessment and the remaining evidence do not show that the functional restrictions resulting from plaintiff's left tendon tear and surgical repair of the condition persisted for a period of at least 12 consecutive months. The ALJ's RFC for a restricted range of light work and his non-disability determination is not inconsistent with Dr. Stevenson's finding that plaintiff's left tendon tear severely affected her functioning. The ALJ's failure to weigh Dr. Stevenson's assessment was harmless error. *See Shields*, 732 F. App'x at 438.

### 3. Medical and opinion evidence related to plaintiff's mental impairments

The record shows that Dr. Bingham, plaintiff's primary care physician, treated plaintiff for symptoms of anxiety and depression in 2014. Dr. Bingham's treatment notes dated February 5, 2014 report that plaintiff's depression appeared to be improved clinically with Cymbalta, and her "chronic anxiety remains controlled with the use of the Xanax" and would continue to be monitored clinically. (Tr. 390). Dr. Bingham reported in September 2014 that plaintiff's "depression and anxiety remain controlled" with Cymbalta and Xanax and the present care would be continued. (Tr. 371).

Consultative examining psychologist Dr. Haley K. O'Connell, Psy.D., evaluated plaintiff at the request of the state agency on November 13, 2014.[4] (Tr. 553-60). On the date of the evaluation, plaintiff was working part-time and caring for her two biological children and two step-children, ages 4, 6, 10 and 12. (Tr. 554). Plaintiff reported stressors related to her children, her history of abuse, and her husband's disabilities and his inability to leave the house. (*Id.*). She reported that while she was currently working part-time, she had trouble dealing with

---

[4] The ALJ and plaintiff refer to the consultative examining psychologist as Dr. Paul Deardorff, Ph.D., but Dr. O'Connell actually performed the evaluation and issued the assessment.

men stemming from her history of abuse. (*Id.*). She reported she had been working 12 to 20 hours per week since June of 2014 as a driver for an auto parts store making deliveries to different shops. (Tr. 555). She stated she was uncomfortable around her male coworkers and explained she tries to "distance [her]self from all the men," and "anxiety gets the best of me because I am dealing with all men. . . . It just makes me uneasy at all times." (*Id.*). She denied problems with understanding directions or completing tasks. (*Id.*). She reported her longest period of employment was two and one-half years in a position with Health Alliance performing the jobs of medical secretary, vascular secretary and sterilization technician. (*Id.*). She was terminated from that position in 2009 for fighting and gossiping. (*Id.*). She stated that she had been terminated from "quite a few positions due to difficulties getting along with others" and attendance issues attributable to her children's illnesses. (*Id.* at 555-56).

Plaintiff reported she had been prescribed psychotropic medications since 2006 and her current medications included Cymbalta and Xanax. (Tr. 555, 560). She did not have a history of psychiatric hospitalization or individual therapy. (Tr. 556). Her daily activities included going to the store, preparing meals, driving, and completing household chores. (*Id.*). She spent the majority of her time taking care of her children and husband. (*Id.*). She independently cared for her grooming and hygiene. (*Id.*). She paid her bills without assistance and reported no difficulty remembering to take her medication or attend doctors' appointments. (*Id.*). She enjoyed listening to music and using the computer, and she maintained regular contact with her husband, children, parents, one sibling, and her in-laws, but she had no friends. (*Id.*).

Mental status findings reflected that plaintiff was clean and neat in appearance. (Tr. 557). She was cooperative and rapport was easily established. (*Id.*). Her "level of emotional

16

distress appeared to have impacted her concentration on the task at hand." (*Id.*). She showed no abnormalities of speech or thought processes. (*Id.*). She appeared to be in "good spirits" as she maintained a normal facial expression, appropriate affect, and adequate eye contact; she interacted appropriately with the evaluator; and her speed and energy level were adequate; however, she was tearful throughout the interview and preoccupied with discussing her emotional difficulties, "primarily unwanted sexual advances by men." (*Id.*). She displayed adequate insight. (*Id.*).

Dr. O'Connell assessed plaintiff with "Unspecified Trauma- and Stressor-Related Disorder." (*Id.*). Dr. O'Connell noted that plaintiff did not report difficulties completing tasks on the job, but it "would not be unexpected for her level of emotional distress and preoccupation to interfere with her ability to maintain focus and concentration throughout the workday." (Tr. 559). Dr. O'Connell noted that although plaintiff had reported some difficulties relating to males and a history of emotional extremes that impacted her ability to relate adequately to others, she "has been maintaining steady employment." (*Id.*). Dr. O'Connell did not assess any specific limitations in plaintiff's ability to focus/concentrate or any other area of mental functioning.

Plaintiff reported to consultative examining physician Dr. Oza in April 2015 that she had a history of anxiety, depression and "difficulty dealing with males as she was abused physically and mentally by her ex-husband," and this had been ongoing since 2000. (Tr. 563). She explained to Dr. Oza that if "she is around males, she feels very agitated, annoyed and she tends to hide in bathroom [sic]. . . ." Plaintiff reported she was taking Cymbalta and Xanax, "which does not do much good." (*Id.*). She had not seen a psychiatrist and was being treated with medication by her family physician. (*Id.*). Dr. Oza concluded: "Plaintiff [has a] history of

17

anxiety and depression. . . . [M]entally, she has problems at this time dealing with men and anxiety with depression, [sic] I think she may need to be seen by [a] psychiatrist." (Tr. 564).

Plaintiff presented to Community Behavioral Health for mental health treatment on January 22, 2016. Plaintiff reported mood swings, trouble getting along with men, some trouble in her relationship with her husband in that she "keeps things inside her until she explodes," a history of abuse, and issues with anxiety. (Tr. 600). She reported having little to no contact with her siblings and she had one friend. (Tr. 600-01). Plaintiff reported an 18-month history of little appetite and feeling sad, worthless, and tired a lot, laying around and isolating a lot, and experiencing mood swings between depressed and normal moods that lasted for several days. (Tr. 603). She reported symptoms of feeling on edge and worrying a lot since 2000. (*Id.*). The intake social worker concluded that plaintiff's primary symptoms appeared to be attributable to PTSD, which were likely causing her depression and anxiety; trouble trusting others given her reports of broken trust in the past; and ADHD (Attention Deficit Hyperactivity Disorder), appearing to meet the criteria given her "predominately inattentive presentation." (Tr. 607). Admission diagnoses were PTSD; major depressive disorder, single episode, mild; and ADHD. Arrangements were made for additional therapy with a female clinician. (Tr. 608).

Plaintiff began therapy with Tayler Stroup, LSW, on February 15, 2016. (Tr. 590-91). Plaintiff's conduct was appropriate, her behavior was cooperative, her stream of thought was clear and coherent, her affect was appropriate, her mood was euthymic, she was oriented times three, her insight was present, and her judgment was good. (*Id.*). Ms. Stroup saw plaintiff on March 4 and 15, 2016, and made these same mental status exam findings on both dates. (Tr. 752-53, 755-57). Ms. Stroup reported on March 15, 2016 that plaintiff had made little progress

due to medical issues and the fact that she was not currently on medication. (Tr. 754). Ms. Stroup made essentially identical mental status findings when she saw plaintiff on April 1 and 7, 2016, except she found plaintiff's mood was "anxious" on the latter date. (Tr. 742-43, 745-46).

Plaintiff initially saw psychiatrist Dr. Marvin Baula, M.D., at Community Behavioral Health on March 21, 2016. (Tr. 747-50). Plaintiff complained of anxiety and irritability. (Tr. 750). At that time, she was taking Xanax and had tried numerous anti-depressants, but none had worked. (*Id.*). Plaintiff reported to Dr. Baula that she did not go out in public without a family member. (*Id.*). She reported that her ex-husband was physically, mentally, and sexually abusive and her childhood was "chaotic." (*Id.*). On mental status examination, Dr. Baula noted that plaintiff was moderately depressed, anxious, and constricted and severely irritable. (Tr. 748.) Her insight was fair. (*Id.*). All other findings were normal. (Tr. 747-48). Dr. Baula increased plaintiff's Xanax dosage. (Tr. 750). At that same visit, a member of the nursing staff assessed plaintiff as alert and oriented times four, clean and kempt, with appropriate eye contact, speech within normal limits, and easy rapport. (*Id.*). Her admitting diagnoses were listed as PTSD; major depressive disorder, single episode, mild; and ADHD, predominantly inattentive. (Tr. 751).

On April 14, 2016, Dr. Baula reported that there were no significant changes in plaintiff's mental status from plaintiff's last visit. (Tr. 737). Dr. Baula continued plaintiff's Xanax. (*Id.*). He reported that plaintiff was applying for disability because she did not think she could work at that time due to PTSD symptoms. (*Id.*). Dr. Baula reported that plaintiff last worked in 2011 and she would get very anxious around crowds, especially men. (*Id.*). He reported that Xanax continued to help with anxiety and panic attacks. (*Id.*).

19

On April 20, 2016, Ms. Stroup completed a Mental Status Questionnaire. (Tr. 761-62). She reported that plaintiff was anxious, she exhibited a flat mood and affect, she had disorganized and racing thoughts and limited concentration, her flow of thought was linear and congruent, and her insight and judgment were good. Ms. Stroup opined that plaintiff would not react well to the pressure of work settings due to social relationship avoidance. (Tr. 762). That same day, Ms. Stroup completed a Daily Activities Questionnaire in which she opined that plaintiff had poor stress tolerance, high anxiety, avoidant social behaviors, and lack of trust, and she was disconnected. (Tr. 763). Ms. Stroup indicated that plaintiff avoided social settings and visited her family only twice per year. (*Id.*). She opined that plaintiff would have to be supervised with the door open in a workplace setting and she would avoid meetings. (*Id.*). She reported that plaintiff had trouble focusing, avoided people, was agitated by others, went shopping at night to avoid crowds, and began chores but did not finish them. (Tr. 764). On April 26, 2016, Dr. Baula co-signed the opinion. (Tr. 765).

Dr. Baula and Ms. Stroup jointly completed a Mental Impairment Questionnaire on April 25, 2016, in which they reported that the frequency and length of contact was once per week for one hour. (Tr. 766). Plaintiff's diagnoses were PTSD, major depressive disorder, generalized anxiety, and ADHD- inattentive type. (*Id.*). The following symptoms were checked on a checkbox list: poor memory, sleep disturbance, mood disturbances, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, catatonia or grossly disorganized behavior, social withdrawal or isolation, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, and hostility and irritability. (*Id.*). Clinically, plaintiff appeared depressed, made minimal eye contact, and fidgeted during sessions.

(Tr. 767). She received medication and counseling and was open to recommendations. (*Id.*).

Dr. Baula and Ms. Stroup opined that plaintiff's impairments were expected to last longer than

one year and plaintiff would be absent more than three times per month due to her impairments.

(*Id.*). Her psychiatric condition exacerbated her physical symptoms in that she had panic

attacks that caused shortness of breath and trouble breathing. (*Id.*). They opined that

plaintiff's mental impairments caused extreme restrictions in activities of daily living, extreme

difficulties in maintaining social functioning, marked deficiencies in concentration, persistence,

or pace, and extreme episodes of deterioration or decompensation in work. (Tr. 768).

The ALJ assigned "little weight" to Ms. Stroup's opinions because he found (1) her

opinion is not a medical opinion from an "acceptable medical source" under SSR 06-3p, and (2)

Ms. Stroup issued her opinion after only a few sessions with plaintiff. (Tr. 57). The ALJ also

declined to give Dr. Baula's opinion "controlling" weight and instead gave the opinion "little"

weight. (*Id.*). The ALJ found that first, Dr. Baula relied heavily on the diagnoses and reports

of plaintiff's social worker, Ms. Stroup. Second, Dr. Baula's findings of marked to extreme

limitations in all areas of mental functioning were not well-supported by the treatment notes,

plaintiff's medical history showing her anxiety was well-controlled by conservative treatment

with medication, and plaintiff's own reports and her testimony, which showed she was able to

engage in a wide range of activities of daily living. (*Id.*, citing Tr. 737-60, 766-68). Finally, a

finding of extreme restrictions caused by episodes of decompensation was inconsistent with the

medical evidence, which demonstrated no episodes of decompensation and indicated that neither

Dr. Baula nor Ms. Stroup applied agency definitions and standards in issuing their assessment.

(*Id.*).

The ALJ gave the opinions of the consultative examining psychologist and state agency reviewing psychologists "little" weight. (Tr. 56-57). The ALJ found examining psychologist Dr. Connelly's opinion was "vague and does not identify specific functional limitations, and subsequent treatment supports that the claimant would be expected to experience some non-exertional limitations." (Tr. 56-57). The ALJ discounted the state agency reviewing psychologists' assessments of mild restrictions because they did not reflect plaintiff's expected mental health limitations, and they had given their opinions before plaintiff received continuing treatment and additional material evidence was submitted into the record. (Tr. 56; *see* Tr. 149, 169).

Plaintiff contends that the ALJ erred in evaluating the opinions of her mental functioning provided by Dr. Baula, Ms. Stroup and Dr. Connelly. (Doc. 11). First, plaintiff argues that the ALJ was bound to weigh Ms. Stroup's opinion under SSR 06-03p and the ALJ was not entitled to reject her opinion on the ground she generated it after only a few sessions with plaintiff. (*Id*. at 10-11). Under the regulations and rulings applicable to plaintiff's claim, only "acceptable medical sources" as defined under former 20 C.F.R. § 404.1513(a)[5] can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to "controlling weight." *See* SSR 06-03p, 2006 WL 2329939, *2.[6] A licensed social worker is

---

[5] Former § 404.1513 was in effect until March 27, 2017, and therefore applies to plaintiff's claim filed in 2014. For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

[6] SSR 06-3p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017). Because plaintiff's claim was filed before the effective date of the rescission, SSR 06-3p applies here.

not an "acceptable medical source" as defined under the applicable Social Security rules and regulations but instead falls under the category of "other source." *Id.*; *compare* former 20 C.F.R. § 404.1513(a) (listing "acceptable medical sources") *with* former 20 C.F.R. § 404.1513(d)(1) (medical sources not listed in § 1513(a), such as therapists, are considered to be "other sources" rather than "acceptable medical sources"). Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2; former 20 C.F.R. § 404.1513(d).

Because Ms. Stroup is not an acceptable medical source, the ALJ was not bound to weigh her opinion in accordance with the regulatory factors. The ALJ complied with the regulations by considering Ms. Stroup's opinion and discounting it for valid reasons which are substantially supported by the evidence. Ms. Stroup saw plaintiff five or so times over a period of less than two months before issuing her assessment of marked and extreme mental limitations, which were not consistent with Ms. Stroup's mental status exam findings. The ALJ did not err in evaluating Ms. Stroup's opinion and giving it "little" weight. (Tr. 56-57).

Next, plaintiff argues that the ALJ erred by discounting Dr. Baula's opinion on the ground it was based heavily on the social worker's diagnoses and reports. (Doc. 11 at 11-12). Plaintiff contends that the findings of non-acceptable medical sources like Ms. Stroup are considered "important" under SSR 06-03P, and the record shows that Dr. Baula treated plaintiff on several occasions and made independent diagnoses. (*Id.* at 12; *see* Tr. 748, 3/16; Tr. 737, 4/2016). Plaintiff also contends that Dr. Baula's opinions are consistent with the assessments provided by Ms. Stroup and Dr. Connelly, each of whom observed that plaintiff was "easily distracted and unable to maintain concentration and focus." (*Id.*). Plaintiff further argues that

23

the record does not show a "history of good control of [plaintiff's] anxiety with conservative medication" as the ALJ found. (Doc. 11 at 12). Plaintiff contends that she complained of anxiety and irritability despite taking Xanax and was moderately anxious on examination in March 2016. (*Id.*, citing Tr. 748, 750). Plaintiff also notes that while an increased dose of Xanax continued to help with anxiety and panic attacks in April 2016, she reported to Dr. Baula that she did not think she could work at that time and she would get very anxious around crowds, especially men, when she "last worked in 2011." (Tr. 737). Finally, plaintiff alleges the ALJ erred by finding Dr. Baula's opinion was inconsistent with plaintiff's ability to engage in a wide range of activities. (Doc. 11 at 12, citing Tr. 57). Plaintiff contends the ALJ relied on a selective reading of the record and failed to recognize the difference between the ability to perform "some basic, sporadic activities of daily living" and the ability to maintain substantial gainful activity. (*Id.* at 13).

The ALJ gave valid reasons for affording Dr. Baula's opinion less than "controlling" weight and only "little" weight, and those reasons are substantially supported by the evidence. The ALJ reasonably concluded that Dr. Baula's opinion was based largely on the diagnoses and reports of plaintiff's therapist, Ms. Stroup, whose opinions the ALJ properly discounted for the reasons discussed *supra*. Dr. Baula had little opportunity to treat plaintiff and independently assess her before providing his opinion. He apparently saw plaintiff only twice over the course of several weeks - once for her initial assessment and three weeks later for a 25-minute office visit – before he and Ms. Stroup issued their assessment. (Tr. 737-40, 747-50). Dr. Baula's notes do not indicate that he made any independent diagnoses of plaintiff's condition; instead, his treatment notes repeat verbatim plaintiff's "Admission Diagnosis," which Dr. Baula did not modify at either office visit. (Tr. 737, 748).

Further, the marked to extreme functional restrictions assessed by Dr. Baula in all areas of mental functioning are not consistent with his own clinical findings or with the other medical evidence of record. Although Dr. Baula and Ms. Stroup both assessed "extreme episodes of deterioration or decompensation in work," there is no evidence that plaintiff experienced *any* episodes of decompensation. The social security regulations define "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning" which may be "demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 711 (6th Cir. 2013) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(4)). Episodes of decompensation "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." *Id.* The ALJ was entitled to discount Dr. Baula and Ms. Stroup's assessment based on the absence of any evidence indicating she suffered one or more periods of decompensation as defined in the regulations.

Nor are the treatment records consistent with Dr. Baula's opinion that plaintiff suffered from debilitating anxiety or other mental health symptoms during the period of alleged disability. Plaintiff complained of anxiety and her Xanax dosage was increased during her initial visit with Dr. Baula in March 2016. (Tr. 750). However, Dr. Baula's mental status examination findings reflect that plaintiff was only moderately anxious, and most of the other mental status examination findings Dr. Baula reported were "normal" or "moderate." (Tr. 747-48). Dr. Baula rated plaintiff's mental status as moderately depressed, anxious and angry and severely

irritable. (Tr. 747-48). Her judgment was fair. (Tr. 748). All other findings were normal. (Tr. 747-48). The nursing notes from that same date reflect no abnormal mental status findings. (Tr. 750). Those notes report that plaintiff was clean and kempt, her eye contact and speech were appropriate, she had an easy rapport, she was logical and coherent, her behavior was cooperative and pleasant, and her mood/affect was good/full. (Tr. 750-51). Dr. Baula reported there were no significant changes in plaintiff's mental status at her next office visit in April 2016. (Tr. 737). Thus, the ALJ properly found that Dr. Baula's assessment of extreme and marked mental limitations was not supported by the treatment records.

In addition, the record supports the ALJ's finding that plaintiff's anxiety was well-controlled by conservative treatment with medication. Plaintiff complained of anxiety throughout the period of alleged disability but she was treated only with medication, which reportedly helped to control her symptoms. Dr. Bingham reported in both February and September 2014 that plaintiff's anxiety remained controlled with Xanax. (Tr. 390, 371). In April 2016, plaintiff reported to Dr. Baula that when "[s]he last worked in 2011 . . . [s]he would get very anxious around crowds, especially around men." (Tr. 737). However, the notes reflect that Xanax "continue[d] to help [with] anxiety and panic attacks." (*Id.*). The ALJ reasonably relied on plaintiff's conservative treatment to discount Dr. Baula's assessment of debilitating mental health symptoms.

Finally, the ALJ reasonably discounted Dr. Baula's assessment based on plaintiff's self-reports of daily and work activities, which included independently taking care of her grooming and hygiene, driving, going to the store, preparing meals, completing household chores, paying her bills independently, spending the majority of her time taking care of her children and disabled husband, listening to music and using the computer, and maintaining regular contact

26

with her husband, children, parents, one sibling, and her in-laws. (Tr. 57, citing Tr. 737-60, 766-68). While an individual's ability to perform household and social activities is not direct evidence of an ability to maintain gainful employment, "[a]n ALJ may . . . consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of . . . ailments." *Keeton v. Commr. of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014). *See also Gilbert v. Comm'r of Soc. Sec.*, No. 2:13-cv-00355, 2014 WL 4659858, at *3 (S.D. Ohio Sept. 17, 2014) (evidence of the plaintiff's daily activities, "including being able to get along with people in social settings, is inconsistent with the conclusion that Plaintiff was someone suffering from a 'disabling mental impairment'"). *Cf. Yates v. Colvin*, 940 F. Supp.2d 664, 674 (S.D. Ohio 2013) (citing *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (permitting an ALJ to consider daily activities such as housework and social activities in evaluating complaints of disabling pain); 20 C.F.R. § 404.1529(c)(3)(i) (authorizing an ALJ to consider activities when evaluating pain and functional limitations)). The ALJ here did not improperly equate plaintiff's ability to perform limited daily activities with an ability to perform substantial gainful activity but instead properly considered whether plaintiff's activities were consistent with the marked and extreme restrictions Dr. Baula assessed. The ALJ's finding that plaintiff's activities were not consistent with such debilitating mental restrictions is well-supported by substantial evidence.

The evidence cited by plaintiff substantiates her claim that she suffers from severe mental impairments and symptoms. However, evidence showing that plaintiff suffers from mental impairments and symptoms does not suffice to demonstrate that the ALJ erred in evaluating her claim of disability. The Court must defer to the ALJ's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial

evidence supports the conclusion reached by the ALJ." *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003) (quoting *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).   Here, the ALJ reviewed the record and fashioned an RFC that included restrictions to account for plaintiff's mental health symptoms.   (Tr. 50).   Plaintiff has not shown that the ALJ was required to include additional restrictions in the RFC to account for plaintiff's mental impairments.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this case be **CLOSED** on the docket of the Court.

Date: __2/19/19__

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TAMARA L. CLEMONS,
    Plaintiff,

Case No. 1:18-cv-119
Dlott, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn*, 474 U.S. 140 (1985); *United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981).